**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| FIJI A. ZAIRE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No.: 8:17-cv-01185-PWG |
| | * | |
| PROTECTIVE SERVICES TRAINING | * | |
| ACADEMY, LLC, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Fiji Zaire, an African American woman, has brought this suit against her former employer, Protective Services Training, LLC ("PST") under Title VII of the Civil Rights Act of 1964. She alleges her supervisors disregarded her complaints that a white, male co-worker had been harassing her on the basis of both her sex and race and that they themselves had repeatedly taunted her because of the color of her skin. She further alleges that shortly after she filed a charge with the Equal Employment Opportunity Commission ("EEOC"), the company withheld a promised promotion, wrote her up for a series of alleged infractions, and then terminated her employment.

Ms. Zaire's lawsuit asserts two claims. The first seeks to hold PST liable for fostering a hostile work environment. The second accuses the company of retaliating against her. PST has moved for summary judgment on both claims.

I conclude that there remain genuine disputes of material fact that preclude me from granting summary judgment for PST on either of Ms. Zaire's claims. I do agree with PST, though,

1

that Ms. Zaire cannot pursue her allegations that various African American supervisors harassed her because of the lightness of her skin, as these assertions bear little to no connection to the allegations she raised in her EEOC charge.

## FACTUAL BACKGROUND

This suit concerns a series of conflicts and confrontations that took place between March 2014 and April 2016, while Ms. Zaire was working at PST's facility in Upper Marlboro, Maryland. *See* Zaire Dep. 29:4-30:20, ECF No. 52-3. PST provides weapons- and security-related training to companies and the general public. *See* Coker Decl. ¶ 5, ECF No. 52-2. Ms. Zaire, who describes herself as a light-skinned African American woman, worked as an associate in the retail shop abutting the gun range. *See* Zaire Dep. 34:11-16, 136:10-17.

### Encounters with Stephen Mlynarski

The chief antagonist in Ms. Zaire's account is a coworker named Stephen Mlynarski, who worked alongside her as a fellow full-time associate.[1] Ms. Zaire stated in her deposition that she "had no issues" with Mr. Mlynarski during the spring and summer of 2014, when he first started working at the shop. *See id.* at 69:16-71:12. In time, though, there began a string of incidents in which Mr. Mlynarski, who is white, made inappropriate comments or otherwise conducted himself in ways that Ms. Zaire found "unprofessional" or "offensive." *See id.* at 73:4-75:8. Ms. Zaire's briefs in opposition to the motion for summary judgment allude to four incidents, in particular:

- **April 2015**: Mr. Mlynarski asked Ms. Zaire to join him and his fiancée for dinner. *See id.* at 97:5-98:21. When Ms. Zaire declined, he said, "Oh, well, why not, because we wanted a threesome?" *See id.* at 97:21-98:1. Ms. Zaire replied, "[D]on't talk to me that way . . . . That's very disrespectful to me for you to think that I would even do something like that." *Id.* at 98:4-7. She immediately reported the episode to her supervisor, Patricia Wilson, who

---

[1] Ms. Zaire and Mr. Mlynarski each enjoyed brief stints as an assistant manager in the retail shop, but the company rescinded those titles in February 2015, restoring both employees to their previous positions as retail associates. *See* Zaire Dep. 47:16-51:2.

promised to discuss the incident with Kelvin Jones, the facility's general manager. *See id.* at 98:14-99:8.

- **May 25, 2015:**[2] Mr. Mlynarski, ostensibly commenting on Ms. Zaire's hair, told her that it looked as though she had "stuck [her] finger in a socket." *Id.* at 75:5-8; *see* Hedrick Dep. 78:15-17, ECF No. 52-5; November 2015 EEOC Charge 2, ECF No. 52-2, Ex. B. PST's finance manager, Betty Hedrick, was present at the time and overheard the comment. *See* Hedrick Dep. 78:8-79:3.

- **October 1, 2015:** While in the store, Mr. Mlynarski "kept putting his hands on [her] shoulder and putting his hands in [her] hair."[3] November 2015 EEOC Charge 2. The following day, Ms. Zaire reported the incident to Janice Simons, human resources manager for PST's parent company, Akal Security, Inc. *See id.* Ms. Simons discussed the matter with Mr. Fraser, who said the allegation sounded like another incident he had previously addressed. *See* Fraser Dep. 222:17-223:15, ECF No. 52-6. Mr. Fraser recalled in his deposition that, in response to the earlier incident, he told Mr. Mlynarski "[t]hat he needs to not, you know, play so much in the store, especially with Ms. Zaire, because she advised me that you guys are not cool like that, you know, so she prefer[s] that he just not joke with her and play with her." *Id.* at 224:21-225:4.

- **October 21, 2015:**[4] Once, as Ms. Zaire entered the store, Mr. Mlynarski said, "Oh, man, I can tell you're black now. . . . Your hair looks so nappy, like you've been picking cotton in the field." Zaire Dep. 74:21-75:4; November 2015 EEOC Charge 2; Reilly Notes of Interview with Zaire 2, ECF No. 52-9. Ms. Zaire reported the incident to Mr. Jones and Ms. Wilson the following day. *See* November 2015 EEOC Charge 2.

There were other comments as well. Once, she said, he told her, "You, as black people, feel like you should be entitled to things." Zaire Dep. 123:2-17. Another time, he remarked that black women are "always so quick to have an attitude." *Id.* at 124:19-22. Ms. Zaire also recalled an incident where Mr. Mlynarski vented his frustration with an African customer who had just left the store, commenting that he "can't stand fucking Africans." *Id.* at 82:11-19.

---

[2] Plaintiff cited this date in her November 2015 EEOC charge. However, in her deposition, she indicated this incident took place in July 2015. *See* Zaire Dep. 78:20-79:17.

[3] Ms. Hedrick recalled that once, in October 2015, Mr. Mlynarski stuck pencils in Ms. Zaire's hair. *See* Hedrick Dep. 80:10-11. "[H]e, I guess, maybe thought he was being funny," she said. *Id.* at 80:13-14.

[4] Here, again, the record is unclear as to timing. Ms. Zaire's EEOC charge says the incident occurred on October 21, 2015, but in her deposition she recalled it as having taken place in May 2015. *See* Zaire Dep. 74:21-77:3.

Beyond these episodes, Ms. Zaire said in her deposition that Mr. Mlynarski made sexual comments about her "multiple times a week." *Id.* at 108:3-22. "He would say stuff about my behind, he would touch me, touch my hair, and I constantly asked him to stop touching me . . . ," she said. *Id.* at 109:3-6. She said he touched her hair or shoulders roughly two to three times per week. *See id.* at 110:4-12.

Ms. Zaire said she discussed some of these incidents with General Manager Kelvin Jones and Store Manager Jermaine Fraser during an hour-long meeting in Mr. Jones's office. *See id.* at 151:15-153:2. "I expressed to them again about things that Steve was doing to me, touching me, saying to me, and how it was making me feel," she said. *Id.* at 151:20-152:1. "And they both told me that I need to quit being so sensitive about the situation. I was told, 'You don't work on Sesame Street, and you're not going to get along with or like people that you work with . . . but you still have to come to work and do your job." *Id.* at 152:2-8.

### Comments Made by Management

Mr. Mlynarski was not alone in offending Ms. Zaire during this time. Ms. Zaire alleges that several members of the company's management team made remarks about her that she considered derogatory.

The first incident occurred in December 2014, when she and several colleagues were driving back from a gun show in Fredericksburg, Virginia. *See id.* at 134:9-135:18. In a text message exchange between Mr. Jones and Ms. Wilson, Mr. Jones wrote, "Becky was givin ammo away" and told Ms. Wilson, "I want u 2 keep a eye on Becky." Jones & Wilson Texts 2, ECF No. 58-6. Ms. Wilson, who was sitting next to Ms. Zaire in the car, wrote back, "Becky telling on herself. I knew u were white." *Id.* at 1; *see* Zaire Dep. 134:20-135:2. Ms. Zaire later saw the exchange and understood that "Becky" was meant to refer to her. *See* Zaire Dep. 135:8-10.

4

("Becky," she said in her deposition, is a derogatory way of referring to a white woman. *See id.* at 136:7-10.) Ms. Zaire said that when she talked to Mr. Jones about it the next Monday, he asked her "why [she] was being so sensitive about it." *Id.* at 135:19-22.

At least two other incidents followed. In April 2015, Office Manager Kathy Jones commented to Ms. Wilson that the food Ms. Zaire had brought in for lunch one day "sounds like some of her white people stuff that she eats." *Id.* at 131:19-132:12. Another time, either in April or May 2015, several managers at the store were talking about Ms. Zaire's looks – specifically, how she looked "like a white girl" – and Mr. Jones again referred to her as "Becky." *Id.* at 133:1-10. Ms. Zaire, who was nearby, said, "I don't think that's funny. Like, why would you call me that?" *Id.* at 133:7-8. Ms. Wilson, according to Ms. Zaire's deposition, replied: "Well, because you're so light-skinned[.] [Y]ou know, you would have been one of the slaves inside of the house telling on us from the outside." *Id.* at 133:11-15. When Ms. Zaire insisted their comments were "offensive," Mr. Fraser added, "Look, she can't even take a joke, and then she's talking like a white girl and saying 'offensive' to me. That's just her white side being upset." *Id.* at 133:18-22.

### First EEOC Charge

Ms. Zaire filed an administrative charge of discrimination with the Prince George's County Human Relations Commission and the EEOC on November 28, 2015. *See* November 2015 EEOC Charge. The charge chronicled a series of incidents involving Mr. Mlynarski between May 2015 and October 2015. *See id.* The list included one incident in October 2015 in which Mr. Jones "bumped up against [her] and stated, 'Uh Oh! I better not touch you cause I might get a complaint!' *Id.* It also noted that Mr. Jones had told colleagues that same month that he "was not going to do anything to Stephen [Mlynarski]" in connection with Ms. Zaire's complaints. *Id.* The

EEOC charge made no mention of Mr. Jones's or Ms. Wilson's use of the word "Becky" or other comments members of the management team had allegedly made about Ms. Zaire's skin tone.

Ms. Zaire's lawyer formally notified the company of the EEOC charge in a letter dated December 28, 2015, characterizing the charge as a "complaint of discriminatory harassment on the basis of her race and sex against Stephen Mlynarski, a co-worker." Cobbina Letter, ECF No. 52-2, Ex. A. Akal Human Resources Compliance Manager Justin Reilly promptly launched an investigation into the allegations against Mr. Mlynarski. *See* Reilly Decl. ¶ 3; Coker Dep. 71:7-21, ECF No. 52-4. Meanwhile, on January 6, 2016, the company suspended Mr. Mlynarski pending the outcome of Mr. Reilly's investigation. *See* Reilly Decl. ¶ 4.

Mr. Reilly interviewed Mr. Mlynarski on January 29, 2016. *See id.* ¶ 9. Mr. Mlynarski resigned the next day. *See id.* ¶ 10.

### Changes in Ms. Zaire's Job Title

Ms. Zaire's job title changed several times during the roughly two years she worked for PST. She was first hired as a part-time retail associate but received two promotions in short order, becoming a full-time associate in June 2014 and then assistant retail manager the following month. *See* Zaire Dep. 34:11-35:21. The company effectively demoted her back to a full-time associate in February 2015, for reasons that remained unclear to Ms. Zaire at the time of her deposition and are not in dispute in this case. *See id.* at 47:16-50:3; February 2015 Payroll Change Notice, ECF No. 52-3, Ex. 6.

Ms. Zaire's title was set to change again heading into 2016. In her deposition, Ms. Zaire said that Mr. Jones, the general manager, told her in November 2015 that he would be promoting

her to the position of retail manager, effective January 1, 2016.[5]  *See* Zaire Dep. 198:1-19.  She

said she later learned that PST President Eugene Morabito had decided that her position would

merely be elevated to assistant retail manager.  *See id.* at 199:10-18.  That promotion took effect

on January 1, 2016.  *See id.* at 58:12-59:7.  Ms. Zaire said she was "happy" to be promoted.  *Id.* at

61:21-22.

**Subsequent Allegations Against Ms. Zaire**

Trouble, though, ensued.  In February 2016, PST Office Manager Kathy Jones began

investigating allegations that Ms. Zaire had violated company policies on back-to-back days the

previous week.  *See* Coker Decl. ¶ 13.  The first allegation was that Ms. Zaire had closed the retail

store two hours early on February 12, 2016, "[w]ithout obtaining appropriate approval from her

supervisor or Office Manager."  March 2016 Investigation Report 1, ECF No. 52-2, Ex. C.  Ms.

Zaire explained that she believed she had to close the store because the rest of the staff, including

the range safety officer, would soon be heading home, and her understanding was that PST policy

required a minimum of two people to be present at closing, for safety reasons.  *See id.* at 8.  Ms.

Zaire further testified that Mr. Fraser, in a phone call, gave her advance authorization to close shop

early.  *See id.*; Zaire Dep. 163:15-164:17.  The report, however, concluded that the decision was

unauthorized.  *See* March 2016 Investigation Report 3.

The second allegation was that Ms. Zaire led Mr. Fraser to believe that a car accident she

had suffered on the morning of February 13, 2016, would not prevent her from coming into work.

*See id.* at 1.  Ms. Zaire's recollection of the morning was that she had called Mr. Fraser after the

---

[5] The offer was never committed to writing.  *See* Zaire Dep. 198:22-199:2.  For its part, the
company denies that it ever offered her the retail manager position, explaining that the position
was not vacant at the time.  *See* Coker Dep. 69:12-19.  Rather, the company notes, Mr. Fraser
held that position from February 2015 to January 2017.  *See* Fraser Dep. 79:15-80:5, 176:20-
178:10.

accident and told him she "wasn't going to make it in due to the roads and that [she] was being towed back to [her] house." *Id.* at 9. The report, though, concluded that she failed to make clear she would not be coming in and that, as a result, the store was closed for the entire day. *See id.* at 1-3.

In response to these incidents, PST suspended Ms. Zaire for three days.[6] March 2016 Letter of Counseling, ECF No. 52-2, Ex. D. The letter announcing the suspension stated: "This is a Final Warning that any future substantiated violations of any nature will result in the termination of your employment with the PSTA." *Id.*

The letter announcing the suspension was dated March 15, 2016. *See id.* By that time, though, several other incidents had transpired. The first of these took place on March 11, 2016, PST President Morabito told Ms. Zaire he was interested in buying .40-caliber ammunition. *See* First Jones Statement 1, ECF No. 52-2, Ex. D. Ms. Zaire said the store was out of that product but that "we were placing an order" to replenish the stock. *See* Zaire Dep. 205:2-3. The vendor later confirmed that he had spoken with Ms. Zaire about the ammunition and had given her a price quote, but that she had not, in fact, placed an order on that date. *See* Jones Investigative Statement 1. Ms. Zaire did, ultimately, place an order with a different vendor on March 15, 2016. *See* Second Jones Statement 1.

The next day, an instructor entered the store around closing time and found it was still open, but no staff members were immediately visible. *See id.* at 2. The instructor, who did not work for PST, said that when Ms. Zaire returned to the retail area, she refused to sell him targets,

---

[6] Ms. Jones's investigative report noted that Ms. Zaire's timesheet for the two-week period in which these incidents took place did not accurately reflect the hours she actually worked on those two dates. *See id.* at 4. In particular, the timesheet indicated she had worked eight hours on February 13, 2016, when in fact she had not worked that day at all. *See id.* The letter announcing her suspension does not allude the timesheet discrepancy. *See* March 2016 Letter of Counseling.

explaining that the register was closed. *See* Haynes Email, ECF No. 52-2, Ex. D. The instructor later discussed the incident with Mr. Fraser. *See id.*

Two days later, on March 14, 2016, PST staff discovered that $20 was missing from the safe, even though a paper record from the last count of the safe's contents (on March 12, 2016) indicated there had been a $10 overage. *See* Hedrick Statement 1, ECF No. 52-2, Ex. D. Finance Manager Betty Hedrick stated that, when she asked Ms. Zaire about the discrepancy, Ms. Zaire said that she had not, in fact, counted the money in the safe, but that, rather, she had simply copied the records for the previous day's count. *See id.* at 2. Later, in an interview with Ms. Jones, Ms. Zaire provided a different account, saying she did count the money in the safe "and that the count was correct." March 22, 2016 Statement 3, ECF No. 52-2, Ex. E.

Ms. Zaire filed a second EEOC charge of discrimination on April 8, 2016. *See* Second EEOC Charge, ECF No. 52-2, Ex. G. This charge alleged that in November 2015 she was promised a promotion to retail manager, but the company reneged on the promise. *See id.* It also referred to her three-day suspension. *See id.* The charge stated: "I believe I have been retaliated against for engaging in protected activity . . . ." *Id.*

The company terminated Ms. Zaire's employment on April 12, 2016. *See* Termination Letter, ECF No. 58-7. The letter formalizing the decision, signed by Chief Administrative Officer Janet Gunn, did not explain the reason for the termination, saying only that PST "is separating your at-will employment." *Id.*

Ms. Zaire brought this suit against PST on April 29, 2017. *See* Compl., ECF No. 1. The Amended Complaint asserts two claims, which I construe as follows: (1) hostile work environment based on sexual and racial harassment in violation of Title VII of the Civil Rights Act of 1964, and

(2) retaliation, also in violation of Title VII. *See* Am. Compl. ¶¶ 62-65, ECF No. 9. PST has moved for summary judgment on both claims. *See* Mot. for Summ. J., ECF No. 52.

The parties have fully briefed their arguments.[7] *See* ECF Nos. 52, 58, 60, 64, 67. No hearing is necessary. *See* Loc. R. 105.6.

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure obliges a court to enter summary judgment in a movant's favor upon a showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that 'might affect the outcome of the suit under the governing law.'" *Smith v. Renal Treatment Ctrs.-Mid-Atl., Inc.*, No. RDB-16-3656, 2018 WL 950018, at *4 (D. Md. Feb. 20, 2018), *aff'd*, 736 F. App'x 68 (4th Cir. 2018). "A dispute of material fact is genuine if the evidence would allow the trier of fact to return a verdict for the nonmoving party." *United Bank v. Buckingham*, 301 F. Supp. 3d 561, 568 (D. Md. 2018). The court must view the facts and make all reasonable inferences "in the light most favorable to the nonmoving party." *Bauer v. Lynch*, 812 F.3d 340, 347 (4th Cir. 2016). In doing so, though, the court maintains an "affirmative obligation to prevent factually unsupported claims and defenses from going to trial." *Smith*, 2018 WL 950018, at *4. "The mere existence of a 'scintilla' of evidence in support of the nonmoving party's case is not sufficient" to defeat summary judgment. *Id.*

---

[7] On January 24, 2019, Ms. Zaire informed me that her counsel in this case, Boniface Cobbina, passed away after a lengthy bout with cancer. Her new lawyer sought leave to file a surreply, arguing that Mr. Cobbina's illness had impaired his representation of Ms. Zaire. *See* ECF No. 62. I granted the motion, authorizing Ms. Zaire to file a surreply and Defendants to file a response to the surreply. *See* ECF No. 63.

## DISCUSSION

PST challenges Counts 1 and 2 alike, raising different arguments in response to each claim. I will address each count in turn.

### Count 1: Hostile Work Environment

Count 1 of the Amended Complaint purports to seek relief for "unlawful harassment" in violation of Title VII. Am. Compl. 13. Based on the legal memoranda they have since submitted, it is clear that both parties construe this count as a hostile work environment claim. The parties, however, do not agree on whether this claim is solely based on a theory of sexual harassment, or whether it encompasses racial harassment as well.

The disagreement arises because the section of the Amended Complaint cataloging Ms. Zaire's legal claims identifies Count 1 as a claim of "Unlawful harassment Based on Sex and Gender in violation of Title VII." Am. Compl. 13. PST, isolating this language from the rest of the pleading, argues that this count asserts a claim for sexual harassment only. *See* Def.'s Mem. 22 n.11, ECF No. 52-1. I note, though, that the very first sentence in the Amended Complaint alleges PST "subjected her to unlawful discriminatory harassment based on her sex *and race*." Am. Compl. ¶ 1 (emphasis added). I also note that the paragraph explaining the legal basis for Count 1 accuses PST of harassing her not only on the basis of her sex, but on the basis of her race. *See id.* ¶ 63.

These statements persuade me that Count 1 seeks relief for both sexual harassment and racial harassment. Notably, the Amended Complaint does not separate these theories into two distinct claims for relief. Ms. Zaire, rather, appears to take the view that the two forms of harassment constitute a single, aggregated claim. *See* Opp'n 24 (arguing a review of Count 1

"should leave no doubt that the essence of Zaire's case encompasses both sex and race and who she is").

Here in the Fourth Circuit, it remains unsettled whether, under Title VII, a plaintiff may bring a "hybrid" hostile work environment claim alleging harassment on the dual bases of race and sex. *See Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335-37 & n.4 (4th Cir. 2010) (analyzing an African American female plaintiff's racial and sexual harassment claims separately, while declining to "address whether she would have been able to sustain a 'hybrid' sex and race claim under Title VII because she had not raised the issue); *see also Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 226 (4th Cir. 2016). At least one other circuit, though, has allowed claims of this sort to proceed in limited circumstances. *See Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 299-300 (6th Cir. 2015) (stating that a "cumulative theory of harassment" may be viable where "a plaintiff alleges multiple hostile-work-environment claims based on different protected classifications (e.g., race plus religious harassment) if one of the plaintiff's independent claims (racial harassment) is sufficient on its own"). And I note that district courts in the Fourth Circuit often have analyzed claims of racial and sexual harassment as one. *See, e.g., Scott v. Health Net Fed. Servs.*, LLC, 807 F. Supp. 2d 527, 535-37 (E.D. Va. 2011); *Cepada v. Bd. of Educ. of Balt. Cty.*, 814 F. Supp. 2d 500, 511-12 (D. Md. 2011); *Orenge v. Veneman*, 218 F. Supp. 2d 758, 766-68 (D. Md. 2002).

Here, I am inclined to allow Ms. Zaire to proceed on a "cumulative theory" of racial and sexual harassment for two reasons. First, it seems to me that, on the facts of this case, the two theories are not so easily disaggregated. It is hard not to notice that many of the allegedly racist comments Ms. Zaire accuses her coworker, Mr. Mlynarski, of making doubled as a comment on Ms. Zaire's looks. And when he was not commenting on her body – for example, by telling her

12

she had a "butt like a black girl," Zaire Dep. 109:18-19, or that her hair looked "so nappy, like [she'd] been picking cotton in the field," *id.* at 74:21-75:4 – he was touching her hair or sticking pencils in it. Surely, a person on the receiving end of comments and actions like these is likely to feel acutely uncomfortable for more than just one reason. *See Mosby-Grant*, 630 F.3d at 336 ("We are keenly away of the difficulties inherent in parsing out Title VII claims by individuals, e.g., African American women, who fall under more than one protected class."); *see also Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 958 (6th Cir. 2014) ("These characteristics [race and sex] do not exist in isolation. African American women are subject to unique stereotypes that neither African American men nor white women must endure."). "It would not be right," as the Sixth Circuit has stated, "to require a judgment against the plaintiff if the sum of all of the harassment [she] experienced was abusive, but the incidents could be separated into several categories, with no one category containing enough incidents to amount to 'pervasive' harassment." *Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1999).

Second, as I will shortly explain, the evidence of *sexual* harassment in this record is clearly sufficient, by itself, to overcome PST's motion for summary judgment. Under the circumstances, I see no need to divide Count 1 in two. I will instead treat Ms. Zaire's hostile work environment claim just as she asserted it – that is, as a single claim encompassing allegations of sexual and racial harassment.

## A.

That said, there is one way in which Count 1 strikes me as divisible. The introduction to Ms. Zaire's memorandum in opposition to the motion for summary judgment captures this aspect of her claim right away, arguing that she was "buffeted on all sides in severe and pervasive ways" while working for PST. Opp'n 2. On one side, it says, was Mr. Mlynarkski, a white coworker,

who allegedly made a number of inappropriate comments touching on Ms. Zaire's race. *See id.* On the other were certain African American supervisors and managers, whom she accuses of making derogatory remarks about her light skin tone. *See id.*; Zaire Dep. 133:7-15.

PST's motion draws the same distinction. There, the company argues – convincingly, in my view – that the allegations involving Ms. Zaire's supervisors are not actionable because she neglected to raise them in her EEOC charge. *See* Def.'s Mem. 22 n.12.

Before bringing a claim under Title VII, a person "must first file an administrative charge with the EEOC within a certain time of the alleged unlawful act." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 508 (4th Cir. 2005) (citing 42 U.S.C. § 2000e-5(e)(1). Ms. Zaire, as I have noted, filed an EEOC charge in November 2015. *See* November 2015 EEOC Charge. PST, though, points out that the charge largely concerned itself with Mr. Mlynarki's conduct. The company argues, accordingly, that Ms. Zaire "failed to exhaust her administrative remedies with respect to any alleged racial harassment claim against Mr. Jones, Ms. Wilson, or any other member of PST's management." Def.'s Mem. 22 n.12.

The exhaustion requirement "is 'an integral part of the Title VII enforcement scheme.'" *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012) (quoting *Chacko*, 429 F.3d at 510). As the Fourth Circuit has explained, "requiring a party to file a charge with the EEOC 'ensures that the employer is put on notice of the alleged violations,' thereby giving it a chance to address the alleged discrimination prior to litigation." *Id.* (citation omitted) (quoting *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005)). It also gives the EEOC the "first crack" at resolving employment discrimination disputes. *Id.* This, the Fourth Circuit has explained, honors "Congress's intent 'to use administrative conciliation as the primary means of handling claims.'" *Id.* (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

One implication of the exhaustion requirement is that it determines the scope of the complainant's rights in an ensuing federal lawsuit. Specifically, courts have held that Title VII plaintiffs may assert "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." *Chacko*, 429 F.3d at 506.

*Chacko v. Patuxent Institution*, 429 F.3d 505 (4th Cir. 2005), illustrates this principle. There, an Indian American correctional officer had filed several EEOC charges. 429 F.3d at 506-07. The most notable of these alleged, first, that he was passed over for a promotion because of his national origin and sex; second, that his supervisors had subjected him to hostile treatment; and, third, that his superiors demoted him in retaliation for his other charges. *See id.* at 507. Nevertheless, in the ensuing Title VII suit, the thrust of the officer's case was "that coworkers continually made derogatory national-origin remarks to him over the course of his twenty-year career, and that supervisors did not discipline these coworkers, laughed at their comments, and may have joined them." *Id.* at 510-11. The Fourth Circuit – noting that the administrative charge and lawsuit referenced "different time frames, actors, and discriminatory conduct" – concluded that the officer had failed to exhaust his administrative remedies. *Id.* at 506.

The case before me is comparable to *Chacko*. Here, the EEOC charge Ms. Zaire filed in November 2015 is narrowly focused on what it describes as "Mr. Mlynarski's unwanted touching and racial comments."[8] November 2015 EEOC Charge. Of the eight bullet points in the writeup documenting her allegations, four chronicle incidents in which Mr. Mlynarski put his hands on her or made inappropriate comments in her presence. *See id.* Three others detail instances in which

---

[8] Ms. Zaire's second EEOC charge, filed in April 2016, accuses PST of retaliating against her in response to her first charge. *See* Second EEOC Charge. It does not otherwise allude to race- or sex-based hostility in her workplace.

Ms. Zaire reported Mr. Mlynarski's behavior to her supervisors or in which a supervisor discussed his unwillingness to fire him in response to her allegations. *See id.* The sole bullet point that does not refer to Mr. Mlynarski by name describes an incident that took place the day after the company's human resources manager relayed one of Ms. Zaire's complaints to the general manager, Mr. Jones. *See id.* Mr. Jones, it alleges, "bumped up against [Ms. Zaire] and stated, 'Uh Oh! I better not touch you cause I might get a complaint!" *Id.*

Ms. Zaire's lawyer at the time, Mr. Cobbina, contextualized the EEOC charge in a December 28, 2015 letter to PST. *See* Cobbina Letter. The letter characterizes the charge as a "complaint of discriminatory harassment on the basis of [Ms. Zaire's] race and sex *against Stephen Mlynarski, a co-worker*." *Id.* (emphasis added).

Ms. Zaire has, of course, recounted in this ensuing civil action many of these same allegations involving Mr. Mlynarski. Her allegations against her supervisors, though, do not appear in the EEOC charge and, in my view, are unrelated to the conflict between the two coworkers.

To be specific, Ms. Zaire alleges that Mr. Jones and other members of the management team referred to her as "Becky" and commented on her light skin. As in *Chacko*, though, these assertions differ in several significant ways from the allegations in the EEOC charge. First, the people she accuses of making these comments were not mere coworkers, as Mr. Mlynarski was; they were supervisors. And second, the prejudice that might conceivably have animated the supervisors' conduct was not the same as the prejudice Mr. Mlynarski allegedly exhibited. Ms. Zaire's supervisors – African Americans all – are accused of harassing her because of the relative lightness of her skin. Mr. Mlynarski, who, again, is white, allegedly harassed her for precisely the opposite reason – i.e., her skin was darker than his.

A charging document ought to put an employer on notice of the complaint's allegations, containing "enough material that the Defendant would have been able to comprehend the accusation, investigate on its own, and either root out the problem or come to the conciliation table with eyes wide open." *U.S. Equal Emp't Opportunity Comm'n v. Phase 2 Invs. Inc.*, 310 F. Supp. 3d 550, 568 (D. Md. 2018). Ms. Zaire's EEOC charge, with its narrow focus on Mr. Mlynarski's conduct, in no way suggested that a broader range of racial biases were plaguing the company. And Ms. Zaire has not persuaded me that a reasonable investigation of the allegations she did raise in the EEOC charge would have uncovered the supervisors' actions. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). I conclude, accordingly, that Ms. Zaire did not administratively exhaust Count 1 insofar as it would hold PST liable for her supervisors' comments relating to race.

**B.**

By contrast, there is no denying that Ms. Zaire's EEOC charge accused Mr. Mlynarski of touching her inappropriately and making a number of sexually and racially charged remarks in the workplace. The question at present is whether the evidence in support of these allegations – and other, similar allegations involving Mr. Mlynarski – is sufficient to sustain a hostile work environment claim in the face of PST's motion for summary judgment. I conclude it is.

"To demonstrate sexual harassment and/or a racially hostile work environment, a plaintiff must show that there is '(1) unwelcome conduct; (2) that is based on the plaintiff's sex and/or race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.'" *Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2011) (quoting *Mosby-Grant*, 630 F.3d at 334). Ms.

Zaire, as I will explain, has made the requisite showing to overcome summary judgment on each of these elements.

1.

"The 'gravamen' of any hostile work environment claim is that the harassment was 'unwelcome.'" *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008). This element of the claim "is 'not a high hurdle.'" *Dawson v. Hous. Auth. of Balt. City*, No. JKB-18-1442, 2019 WL 161497, at *3 (D. Md. Jan. 10, 2019) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018)). Courts consider the alleged harasser's conduct welcome where the accuser "is a willing and active participant in the conduct." *Id.*

Here, PST does not dispute that a reasonable jury could determine that the harassment Ms. Zaire has alleged in this suit was unwelcome. Ms. Zaire did, after all, complain about Mr. Mlynarski's behavior in her November 2015 EEOC charge, making clear that she did not "appreciate" his racist and sexual comments. November 2015 EEOC Charge. In one instance, she wrote, she asked Mr. Mlynarski "several times" to stop touching her shoulders and hair, and when he did not relent, she threatened to punch him "if he touched [her] again." *Id.* In addition, as I will discuss in further detail momentarily, Ms. Zaire has testified that she reported his conduct to management several times. *See* Zaire Dep. 144:17-145:3, 149:15-150:16, 151:9-152:20. In view of these assertions, I have little difficulty concluding that Ms. Zaire has "sufficiently alleged that the harassment was unwelcome." *Sunbelt Rentals*, 521 F.3d at 314 (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000)); *see also E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d at 175 (4th Cir. 2009)).

**2.**

Moving on to the second element, Ms. Zaire must present sufficient evidence that the harassment was "based on" her membership in a protected class. *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007). To meet her burden, she must demonstrate that there remains a genuine dispute of material fact as to whether, "'but for' [her] race or sex, she 'would not have been the victim of the alleged [harassment].'" *Cepada*, 814 F. Supp. 2d at 511 (quoting *Gilliam*, 474 F.3d at 142).

PST, focusing exclusively on the Amended Complaint's allegations of sexual harassment, contends "[t]here is nothing in the record that affirmatively establishes that Mr. Mlynarski made any comments or touched Plaintiff because she is a woman." Def.'s Mem. 24. The company cites two cases in support of its position: *Lewis v. Baltimore City Board of School Commissioners*, 187 F. Supp. 3d 588 (D. Md. 2016), and *Douglas v. Dabney S. Lancaster Community College*, 990 F. Supp. 447 (W.D. Va. 1997). Both of these cases, though, are easily distinguishable from the one before me.

*Lewis* involved a dispute between an assistant principal and a principal, both of whom were women. 187 F. Supp. 3d at 591-92. In her Title VII lawsuit against the Board of School Commissioners, the assistant principal alleged that the principal had reprimanded her in front of colleagues and had sent her an anonymous letter in which she insulted the assistant principal's appearance, describing her as "a he-man with that big, donkey ass." *Id.* at 595. The district court, in reviewing the assistant principal's sexual harassment claim, granted summary judgment for the Board. *See id.* The court based its judgment on its assessment that the evidence showed the principal's actions were "motivated by her general hostility towards [the assistant principal] and dissatisfaction with her job performance, rather than by [the assistant principal's] sex." *Id.* By

19

contrast, the court stated, there was no evidence that the principal was sexually interested in the assistant principal or, for that matter, that she was "generally hostile towards other women at the school or that she treated women differently from men." *Id.*

The fact pattern in *Douglas* was more complicated, in that the Title VII plaintiff, a community college professor, had named several individual administrators as defendants. 990 F. Supp. at 452. Faced with a flurry of summary judgment motions, the district court concluded that the sexual harassment claim against one administrator in particular, the dean of academics and instruction, could proceed. The court easily found that the plaintiff had produced sufficient evidence to defeat the dean's motion for summary judgment, noting that the dean had repeatedly sexually propositioned her, made other inappropriate comments, and threatened to harm her career. *See id.* at 461-62. The court proceeded to hold, though, that the college could not be liable under a negligence theory for the actions of other administrators who had treated her callously at work. *See id.* at 462-63. While one of those administrators had once called the plaintiff a "bitch," the court explained that there was "nothing overtly sexual" about these administrators' actions, nor was there "any evidence that these events took place because the plaintiff was a woman." *Id.* at 463.

Here, Ms. Zaire does not accuse Mr. Mlynarski of mere callous or disrespectful treatment. Rather, her allegations – like the plaintiff's allegations against the dean in *Douglas* – are inextricably linked to sex. Ms. Zaire has testified that Mr. Mlynarski "constantly" invited her to meet him outside of work and that he once said his fiancée had wanted to have a "threesome" with her. *See* Zaire Dep. 94:11-95:21, 96:15-98:7. He commented on her behind "[a] couple times a week," once telling her that she "had a butt like a black girl." *Id.* at 109:7-19. And, beyond all this, Ms. Zaire alleges he regularly "caress[ed]" her shoulders and back. *Id.* at 110:16-111:6. Ms.

20

Zaire has estimated the unwanted touching occurred "two to three times a week," despite her protests. *Id.* at 110:7-12. Presented with these allegations, a reasonable juror easily could find that Mr. Mlynarski harassed Ms. Zaire on the basis of her sex. *See Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

I am likewise convinced that a reasonable juror could find that Mr. Mlynarski's comments and actions were motivated, at least in part, by Ms. Zaire's race. Several of the alleged comments were unquestionably racial in nature. *See Cent. Wholesalers*, 573 F.3d at 175 (finding the second element of a racial harassment claim was adequately established to survive summary judgment where the plaintiff's coworkers had used racial epithets and made references to slavery). There was, for instance, the remark that Ms. Zaire "had a butt like a black girl" but "looked like a white girl." Zaire Dep. 109:18-19. Another time, Mr. Mlynarski allegedly said: "Oh, man, I can tell you're black now. . . . Your hair looks so nappy, like you've been picking cotton in the field." *Id.* I do not doubt, either, that a jury could reasonable infer that Mr. Mlynarski's habit of touching her hair (or, in one instance, sticking pencils in it) was connected in some way to Ms. Zaire's race. I conclude, accordingly, that Ms. Zaire has met her burden on this element of her hostile work environment claim.

**3.**

The third element "requires a showing that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2014) (en banc). This element, the Fourth Circuit has explained, "has both subjective and objective parts." *Freeman*, 750 F.3d at 421. First, under the subjective prong, the plaintiff must show that she perceived the work environment as abusive or hostile. *See id.* Second,

under the objective prong, she must establish that a reasonable person in the plaintiff's position would likewise perceive the harassment as severe or pervasive. *See id.*

That Ms. Zaire found Mr. Mlynarski's behavior subjectively offensive does not appear to be disputed. PST argues, though, that the alleged offenses were not so serious or frequent that a reasonable person in Ms. Zaire's shoes would view the workplace as abusive or hostile. *See* Reply 12, ECF No. 60.

"[T]he question of whether 'harassment was sufficiently severe or pervasive is quintessentially a question of fact.'" *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (quoting *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 773 (4th Cir. 1997)). In making its determination, a court must judge the harassment "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). Circumstances bearing on this analysis may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). This standard protects working women and men "from the kind of . . . attentions that can make the workplace hellish," *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333 (4th Cir. 2003) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)), while, at the same time, "filter[ing] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," *id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

PST accuses Ms. Zaire of "attempt[ing] to create a triable issue of fact based upon nothing more than a series of statements and comments by Mr. Mlynarski that are hearsay, self-serving, and otherwise constitute 'stray comments' that are not sufficiently supported by the record in this case." Reply 5. To be clear, though, Ms. Zaire's allegations are by no means limited to "statements and comments." In her deposition, she testified that beginning in October 2014, Mr. Mlynarski caressed her back, arms, shoulders, or hair "two to three times a week" in ways that made her uncomfortable. Zaire Dep. 110:7-111:6. A coworker, Ms. Hedrick, recalled one of those episodes, confirming that Mr. Mlynarski not only touched Ms. Zaire's shoulders and hair but stuck pencils in her hair. *See* Hedrick Dep. 79:18-80:11. Ms. Zaire said she "consistently asked him to stop" touching her, even threatening on a few occasions to punch him in the face if he did not. Zaire Dep. 109:4-5, 112:2-113:5. Mr. Mlynarski's response to one such threat was, "Well, I might like that." *Id.* at 113:8.

The inappropriate comments arrived with similar regularity. Ms. Zaire said sex was "a constant, ongoing theme with him," alleging he made sexual comments about her "[m]ultiple times a week." *Id.* at 108:13-22. He commented on her behind, specifically a "couple times a week." *Id.* at 109:7-11. Ms. Zaire said she complained about Mr. Mlynarski's behavior to management several times, to little avail. *See id.* at 144:17-145:2, 149:15-150:1, 151:15-152:1. While she continued to work at the store,[9] her demeanor had changed enough for at least some of her supervisors to notice that "something must be going on with [her]." *Id.* at 151:15-19.

The incessant touching and sexually tinged comments separate this case from *Naylor v. City of Bowie*, 78 F. Supp. 2d 469 (D. Md. 1999), a case PST cites in its reply brief. *See* Reply 10.

---

[9] "'Title VII comes into play before the harassing conduct leads to a nervous breakdown.' The fact that a plaintiff continued to work under difficult conditions is to her credit, not the harasser's." *Fairbrook Med. Clinic*, 609 F.3d at 330 (quoting *Harris*, 510 U.S. at 22).

There, a female laborer at a wastewater treatment plant alleged that her supervisor sexually harassed her over a period of more than seven months. 78 F. Supp. 2d at 471. She alleged, in particular, that he gave her a number of cards and gifts (including, once, a box of candies concealing a wrapped condom) and twice uttered comments that made her uncomfortable – specifically, that he "'loved' to watch her work" and, on another occasion, that he "certainly wouldn't mind" getting "into her pants." *Id.* at 471-73. The district court, granting summary judgment for the City, characterized the "vast majority" of the alleged encounters as "innocuous occurrences between a man and a woman interacting during the course of their employment," noting that "[o]nly a few of the challenged acts had a sexual connotation." *Id.* at 476-77. The court pointed out that the supervisor had made no attempts to kiss the plaintiff "or to physically force himself upon her in a sexual encounter." *Id.* at 477. The court concluded, accordingly, that the supervisor's conduct "was not sufficiently severe or pervasive to support a claim of hostile work environment sexual harassment under Title VII." *Id.* at 476.

Ms. Zaire, by contrast, has accused Mr. Mlynarski of consistently ignoring her pleas to stop caressing her. Certainly, a reasonable jury could find that his actions "altered the conditions of [Ms. Zaire's] employment and created an objectively abusive work environment." *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994). That being so, Ms. Zaire has shown the alleged sexual harassment in this case was sufficiently severe and pervasive to make out a hostile work environment claim. *See id.*

Mr. Mlynarski's offenses can only be seen as even more severe and pervasive when one considers the allegations that he harassed Ms. Zaire on the basis of her race. *See Mosby-Grant*, 630 F.3d at 336 ("[A] hostile work environment claim can be bolstered by relying on evidence of a workplace tainted by both sex and racial discrimination."); *Hicks v. Gates Rubber Co.*, 833 F.2d

24

1406, 1416 (10th Cir. 1987) (holding that "a trial court may aggregate evidence of racial hostility with evidence of sexual hostility" for purposes of "determining the pervasiveness of the harassment against a plaintiff"). PST counts no more than two such incidents.[10] *See* Reply 11. My own review of the record, however, is not quite so narrow.

Ms. Zaire estimated in her deposition that Mr. Mlynarki made race-related comments, either about her or other people, about 10 times. *See* Zaire Dep. 122:10. At least six of those comments are particularized in the record. These include: telling her that her "hair was nappy" and that it looked as though she had "stuck [her] finger in a socket," *id.* at 78:20-22; saying she "had a butt like a black girl but that [she] looked like a white girl," *id.* at 109:18-19; saying, "Oh, man, I can tell you're black now. . . . Your hair looks so nappy, like you've been picking cotton in the field," *id.* at 75:2-4; commenting to her that, "You, as black people, feel like you should be entitled to things," *id.* at 123:2-17; telling her that black women are "always so quick to have an attitude," *id.* at 124:19-22; and saying, after an apparently foreign-born customer had left the store, that he "can't stand fucking Africans, they get on his nerves. If they come here, they should learn to speak English," *id.* at 82:11-19.

PST, in addition to ignoring some of these comments, overlooks the evidence that Mr. Mlynarski did not merely talk about her hair; he also ran his fingers through it, and on one occasion allegedly stuck pencils in it. *See id.* at 109:4; Hedrick Dep. 79:18-80:11. While PST might prefer

---

[10] PST also urges me to disregard Ms. Zaire's testimony as "uncorroborated." Reply 11. But whether or not she has offered "extensive corroborating evidence" at this stage of the proceedings "is of little import, because the volume of corroborating evidence 'relates only to the credibility and weight of the evidence, which are issues for the jury.'" *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 160 (4th Cir. 2018) (quoting *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004)).

to characterize these episodes as strictly sex-based conduct, I have little doubt that a reasonable jury could find that there was a racial component to them.

In sum, PST has not persuaded me that sexual and racial harassment was insufficiently severe to sustain a hostile work environment claim. Their argument on this point does not entitle the company to summary judgment.

4.

"The last element of a hostile work environment claim is that some basis exists for imputing liability to" the defendant. *Smith*, 202 F.3d at 243. If, as here, the harassing employee was the plaintiff's coworker (as opposed to a supervisor), "the employer is liable only if it was negligent in controlling working conditions." *Boyer-Liberto*, 786 F.3d at 278 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). That will be the case where "the employer 'knew or should have known about the harassment and failed to take effective action to stop it.'" *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 255 (4th Cir. 2015) (quoting *Howard v. Winter*, 446 F.3d 559, 565 (4th Cir. 2006)). "The distribution of an anti-harassment policy provides 'compelling proof' that the company exercised reasonable care in preventing and correcting harassment." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 335 (4th Cir. 2011). In the face of such evidence, a plaintiff "must show by a preponderance of the evidence that the policy was either adopted or administered in bad faith or that it was otherwise defective or dysfunctional." *Id.*; *see Cooper v. Smithfield Packing Co.*, 724 F. App'x 197, 203 (4th Cir. 2018).

Ms. Zaire has acknowledged that, upon joining the company, she received PST's Employee Handbook, which includes a statement that the company "prohibits sexual and other forms of unlawful harassment based on race, color, sex," and other factors. Employee Handbook 2, ECF No. 52-3; *see* Zaire Dep. 24:7-25:4. The handbook directs employees who believe they have

experienced unlawful discrimination or harassment to report the matter to their supervisor. *See* Employee Handbook 2.

Ms. Zaire has offered evidence that she did, in fact, report Mr. Mlynarski's conduct to her supervisor and other members of the management team on several occasions. She has also offered evidence that management's response was lackluster. For instance, in spring 2015, she told a member of the management team, Ms. Wilson, that Mr. Mlynarski had talked about having a "threesome" with her (Ms. Zaire) and his fiancée. *See* Zaire Dep. 98:14-20. Ms. Wilson promised to discuss the issue with the general manager, Mr. Jones. *See id.* at 99:6-8. She did not follow up with Ms. Zaire.[11] *See id.* at 99:9-11.

That same spring, Ms. Zaire said, she told an Akal human resources manager, Janice Simons, that Mr. Mlynarski had been touching her without her consent and had made various racial and sexual comments about her. *See id.* at 144:20-146:21. Ms. Simons apparently relayed her complaints to the retail store manager, Mr. Fraser, who has testified that he had previously told Mr. Mlynarski, in response to a different complaint, that "he needs to not, you know, play so much in the store, especially with Ms. Zaire, because she advised me that you guys are not cool like that." Fraser Dep. 222:17-225:4. It is unclear whether Mr. Fraser repeated this admonition after learning of the new complaint.

Ms. Simons later asked Ms. Zaire whether things had gotten better. Ms. Zaire said no. *See* Zaire Dep. 148:13-16. In fact, she said, the day after she made the complaint to Ms. Simons, Mr. Jones "bumped against" her while she was opening the store and said, "Uh-oh, I better not touch

---

[11] On another occasion, Ms. Hedrick took it upon herself to speak to the office manager, Ms. Jones, after seeing Mr. Mlynarski rub Ms. Zaire's back. *See* Zaire Dep. 114:3-115:1. "She said that she told Kathy [Jones], 'You may need to go in the store, because Steve [Mlynarski] is touching Fiji and she's not having it . . . .'" *Id.* at 115:13-15. According to Ms. Zaire, though, Ms. Jones did not come to the store and did not follow up with Ms. Zaire. *See id.* at 115:17-22.

you because you might complain people touch you." *Id.* at 147:20-148:4. "I felt like he was belittling my complaints, that he took it as a joke," Ms. Zaire said in her deposition. *Id.* at 148:5-7.

Mr. Jones and Mr. Fraser were similarly dismissive, she said, when she again discussed Mr. Mlynarski's behavior (including both the comments and touching during a meeting in Mr. Jones's office. *See id.* at 152:15-153:4. "[T]hey both told me that I need to quit being so sensitive about the situation," Ms. Zaire recalled. *Id.* at 152:2-3. "I was told, 'You don't work on Sesame Street, and you're not going to get along with or like people that you work with or situations that you have to go in and work on, but you still have to come to work and do your job.'" *Id.* at 152:3-8. Neither manager told Zaire that they would follow up on her complaints. *See id.* at 153:5-8.

By June 2015, Mr. Mlynarski's behavior had yet to change. When Ms. Zaire again told Mr. Jones that Mr. Mlynarski "will not stop touching" her, Mr. Jones replied, "Just give me time. Just give me time. I'm going to look into it." *Id.* at 150:2-16. Ms. Hedrick and Ms. Wilson, who overheard the complaint, told Ms. Zaire afterward, "I hope you know nothing's going to come from this." *Id.* at 150:17-19. "[T]hey said, 'Well, Steve's been getting all kind of reports. I've been reporting stuff to Kelvin [Jones], Betty's been reporting, and nothing gets done with it comes to Steve. He's not going to do anything to him." *Id.* at 150:20-151:2.

PST notes that in January 2016 – shortly after Ms. Zaire's attorney notified the company via letter that Ms. Zaire had filed an EEOC charge – it "immediately suspended" Mr. Mlynarski and launched an investigation. Def.'s Mem. 28. By that point, though, Ms. Zaire had purportedly been complaining about Mr. Mlynarski's behavior for some nine months. There remains, in my view, a genuine dispute as to whether PST's response to those complaints was prompt and reasonable. *See Cent. Wholesalers*, 573 F.3d at 177-78; *White v. BFI Waste Servs., LLC*, 375 F.3d

28

288, 299-300 (4th Cir. 2004). For this reason, too, the company is not entitled to summary judgment.

## Count 2: Retaliation

PST next challenges Count 2, which accuses the company of retaliating against Ms. Zaire in violation of Title VII. The Amended Complaint charges PST with three retaliatory actions, in particular: first, "reneging on Plaintiff's promotion as retai[l] manager"; second, "attempting to discipline the Plaintiff without any basis"; and, third, "terminating her." Am. Compl. ¶ 65.

A plaintiff may prove a Title VII retaliation claim "either through direct and indirect evidence of retaliatory animus, or through the burden-shifting framework" the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). It is up to the plaintiff to decide which path to take. *See id.* Ms. Zaire's response in opposition to PST's motion for summary judgment suggests she intends to rely on the *McDonnell Douglas* framework. *See* Opp'n 27.

Under *McDonell Douglas*, the plaintiff first bears the burden of establishing a prima facie case of retaliation. To do this, she must show that (1) she "engaged in a protected activity"; (2) her employer "acted adversely" against her; and (3) "the protected activity was causally connected to the adverse action." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). If the plaintiff makes the requisite showing, "the employer may then rebut the prima facie case by showing there was a legitimate non-discriminatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that those reasons are pretextual." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir. 1997) (citation omitted).

In addressing Count 2, PST's motion for summary judgment first challenges Ms. Zaire's contention that the company reneged on a promise to promote her to retail manager.[12] PST argues the promotion was never in the offing because the retail manager position was not open; on the contrary, it notes, Mr. Fraser held the retail manager position from February 2015 until sometime after Ms. Zaire's termination. *See* Def.'s Mem. 29; Fraser Dep. 35:18-21, 80:2-5. The company further notes that Ms. Zaire "never received any offer letter or terms and conditions for the retail manager position." Def.'s Mem. 30.

These are factual contentions, which the company may of course present to a jury, should this case proceed to trial. In my view, though, it cannot be said that Ms. Zaire has failed to place this issue in dispute. She has given sworn testimony that Mr. Jones promised in November 2015 to promote her to retail manager. *See* Zaire Dep. 198:11-19. Ms. Hedrick, the finance manager, said she was present for the discussion between Mr. Jones and Ms. Zaire and confirmed that he had told Ms. Zaire he "wanted to make her the store manager." Hedrick Dep. 70:13-15, 75:17-21. And while it does not appear that Ms. Zaire disputes that Mr. Fraser was continuing to serve as

---

[12] Among PST's arguments, one is that Ms. Zaire "abandoned" this claim because her response in opposition to the motion for summary judgment neglected to counter the points the company had raised in its motion. *See* Reply 17 (citing *Khatana v. Wash. Metro. Transit Auth.*, No. PWG-15-1664, 2017 WL 749233, at *5 (D. Md. Feb. 27, 2017)). Ms. Zaire has acknowledged that the response memorandum her previous attorney submitted was of questionable quality – a consequence, perhaps, of the debilitating illness that ultimately took his life. *See* Mot. for Leave to File Surreply 2, ECF No. 62-1. It is for this reason, mainly, that I authorized Ms. Zaire's new attorney to file a surreply. ECF No. 63. The surreply, I note, argues PST President Morabito withdrew the company's promise to promote Ms. Zaire to retail manager and that a jury "may infer that Morabito had retaliatory animus against Ms. Zaire for her EEO complaint made three weeks earlier." Surreply 5. Accordingly, I reject the company's argument that Ms. Zaire abandoned her claim.

retail manager throughout this time, she has explained that "he had been moved out of the retail store, because [she] was promised the position." Zaire Dep. 196:14-18.

PST emphasizes that Ms. Zaire did, in fact, receive a promotion – not to retail manager, but to assistant retail manager. *See* Def.'s Mem. 30; Resp. to Surreply 7, ECF No. 67. That promotion, it notes, took effect on January 1, 2016, shortly after the company learned of Ms. Zaire's EEOC charge. *See* ECF No. 52-3, Ex. 7. "If PST truly intended to retaliate against Plaintiff, it could have just as easily not offered her any promotion . . . ." the company argues. Rep. to Surreply 7.

This, too, is an argument PST may present to a jury. Here, though, in reviewing a motion for summary judgment, I am forbidden to weigh the evidence. *See Foster*, 787 F.3d at 248. My charge, rather, is to assess whether "the facts and all justifiable inferences arising therefrom in the light most favorable" to Ms. Zaire fail to demonstrate a genuine dispute of material fact. *Id.* (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013)). To that end, there is no dispute that Ms. Zaire's submission of an EEOC charge in November 2015 constituted a "protected activity." *See Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 444 (D. Md. 2015). PST likewise does not argue that a failure to promote an employee is an adverse action that may give rise to a Title VII retaliation claim, *see Wagstaff v. City of Durham*, 233 F. Supp. 2d 739, 744 (M.D.N.C. 2002), *aff'd*, 70 F. App'x 725 (4th Cir. 2003), and even if the company does mean to argue that a failure-to-promote claim cannot proceed where the company ultimately did offer the employee a promotion (albeit to a position less senior than the one she had been promised), it has cited no authority for this proposition, and I am aware of none.

It also is unclear to me whether PST contends that Ms. Zaire's protected activity was not causally connected to the decision to deny her the promotion to retail manager. Nevertheless, as

the Fourth Circuit recently explained, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers v. City of Laurel*, 895 F.3d 317, 335 (4th Cir. 2018). To clear the bar, the employee need only show "that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *Id.* at 335-36. Here, Ms. Zaire filed her EEOC charge on November 28, 2015, *see* November 2015 EEOC Charge, and her attorney notified the company of the charge in a December 28, 2015 letter, *see* Cobbina Letter. Ms. Zaire has said she learned a short time later, in January 2016, that Mr. Morabito had decided the promotion would be to assistant retail manager, rather than to retail manager. *See* Zaire Dep. 199:2-200:10. The "temporal proximity" of these events is enough to establish a causal connection at the prima facie stage. *See Strothers*, 895 F.3d at 336-37.

To be sure, PST has shown there was a legitimate, non-retaliatory reason for withholding the promotion to retail manager. Specifically, as I have already noted, it has offered evidence that the position was not actually available and that there were budgetary reasons for classifying the position it ultimately did offer her as merely an "assistant" retail manager position. *See* Hedrick Dep. 110:11-21. This, however, is not the end of the inquiry. Under the *McDonnell Douglas* framework, the burden shifts back to Ms. Zaire to show that the company's stated reasons for taking an adverse action against her were, in fact, pretextual. See *Patrick v. Ridge*, 394 F.3d 311, 316-17 (5th Cir. 2004).

Here, again, we must consider causation. Now, though, the employee faces a heavier burden than she did at the prima facie stage. To meet this burden, the employee must demonstrate "that retaliation was the actual reason for the challenged" adverse action. *Foster*, 787 F.3d at 252. That is to say, she "must establish 'both that the employer's reason was false and that retaliation

was the real reason for the challenged conduct.'" *Id.* (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)). The employee need not show that the protected activity was the *sole* cause of the adverse action. Her burden, rather, is to show that it was a "but-for" cause. *See Guessous v. Fairview Prop. Invs.*, LLC, 828 F.3d 208, 217 (4th Cir. 2016).

In considering this final step in the *McDonnell Douglas* analysis, a few facts strike me as relevant. First, Ms. Hedrick has confirmed that, shortly before Ms. Zaire filed her EEOC charge on November 28, 2015, Mr. Jones told Ms. Zaire he "wanted" to promote her to retail manager. Hedrick Dep. 70:13-15, 75:17-21. Ms. Zaire has testified that she continued to believe that promotion was in the works in the days after her attorney sent a letter notifying the company of the EEOC charge. *See* Zaire Dep. 197:2-20. That letter was addressed to PST's president, Mr. Morabito. *See* Cobbina Letter. While the record leaves unclear precisely when Mr. Morabito decided to nix the promotion to retail manager, Ms. Zaire appears to have learned of that decision within three weeks after counsel sent the letter. *See* Zaire Dep. 199:2-200:3; Surreply 5 (stating Ms. Hedrick informed Ms. Zaire of Mr. Morabito's decision on January 20, 2016). This timeline supports an inference that Mr. Morabito knew of the EEOC charge and denied the proposed promotion because of it. *See Guessous*, 828 F.3d at 218 (considering temporal proximity as a factor in assessing whether a plaintiff had created a trial issue as to whether the employer's proffered justification was pretextual); *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 650 F.3d 562, 569 n.21 (5th Cir. 2011) (explaining that temporal proximity, standing alone, "is not enough to sustain the plaintiff's ultimate burden" but that it carries "significant weight").

Second, Ms. Zaire has testified that when she asked Ms. Hedrick why Mr. Morabito vetoed the promotion, Ms. Hedrick replied, "Well, you kind of know why." Zaire Dep. 200:2-9. This

remark, if credited, might likewise permit a jury to infer that Mr. Morabito sought to retaliate against Ms. Zaire for filing the EEOC charge.

In sum, PST has not persuaded me that it is entitled to summary judgment on the question of whether the decision to promote Ms. Zaire to assistant retail manager, rather than retail manager, was retaliatory. This claim will proceed.

**B.**

PST also challenges Ms. Zaire's assertion that both her April 2016 termination and the various disciplinary actions that led up to it were themselves retaliatory. As to this aspect of her Title VII retaliation claim, the company does not appear to dispute that Ms. Zaire's EEOC charge was a protected activity, that the discipline and terminations were adverse actions, or that the amount of time that passed between the protected activity and adverse actions was short enough to establish the causal connection necessary to state a prime facie case of retaliation. The company argues, rather, that it had legitimate, non-retaliatory reasons for disciplining and, ultimately, firing Ms. Zaire and that she cannot meet her burden of showing that those reasons were pretextual. *See* Def.'s Mem. 30. Specifically, it says, Ms. Zaire "cannot show 'but for' causation between her disciplinary actions, which also constituted the underlying reasons for her termination, and her protected activity," and cannot prove that PST's stated reasons were false. *Id.*

PST asserts that the discipline and termination were based on seven infractions Ms. Zaire committed on two sets of back-to-back days in mid-February and mid-March 2016. The first two alleged infractions occurred on February 12 and 13, 2016. These were: closing the store two hours early without management approval and failing to show up for work the next day after notifying

her supervisor that she had been in a car accident.[13] *See* March 2016 Investigation Report. The next incident occurred on March 11, 2016, when Ms. Zaire allegedly told PST's president, incorrectly, that she had ordered a shipment of .40-caliber bullets. *See* First Jones Statement 1-2. The remaining four infractions were said to occur the following day. These were: leaving the state's cleaning contractor unaccompanied behind the counter for 10 to 15 minutes; telling an instructor at closing time that the register was closed and he could not buy targets and, around the same time, barring one of his students from exiting the facility through the store; failing to close the store and lock the doors 10 minutes after closing time; and providing an inaccurate tally of the money in the store's safe, documenting a $10 overage when, in fact, the safe was missing $20. *See id.*; Second Jones Statement, ECF No. 52-2; Haynes Email.

PST has, without question, met its burden of producing evidence that there were legitimate, non-retaliatory reasons for disciplining Ms. Zaire and terminating her employment. *See Munday*, 126 F.3d at 242. To overcome the company's motion, Ms. Zaire must show that the proffered reasons were a mere "pretext to disguise the true retaliatory reason" for the adverse actions. *Guessous*, 828 F.3d at 217. To be clear, she need not establish that retaliation "was the sole cause" for the company's actions; her burden, rather, "is only to show that the protected activity was a but-for cause." *Id.* That is, she must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 217 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

---

[13] The last page of Ms. Jones's March 8, 2016 investigation report notes, in a section labeled "Records Review," that Ms. Zaire's timecard incorrectly stated that she worked 10.5 hours on February 12, 2016 and 8 hours on February 13, 2016. *See* March 2016 Investigation Report 4. While PST's motion characterizes the inaccuracy as a "falsification" that "alone could have constituted sufficient grounds" for her termination, Def.'s Mem. 14, the parties have not directed my attention to any material in the record that might indicate the company based its decisions to discipline or terminate her on this particular allegation.

Ms. Zaire's surreply to PST's motion argues the timing and number of alleged infractions are suspicious in and of themselves. "What are the odds," it asks, that an employee with no prior history of formal discipline "would fall that quickly out of favor"? Surreply 11. Ms. Zaire worked for PST for slightly longer than two years, beginning in March 2014. *See* Zaire Dep. 18:19-21. During the time that he supervised her, starting in February 2015, Mr. Fraser could not recall ever disciplining her, save for when they had "had a conversation about . . . coming back from lunch late, and [there] was a uniform issue." Fraser Dep. 144:17-146:2. And yet, in the course of four days in February and March 2016, Ms. Zaire racked up seven infractions, resulting first in a suspension and then in the termination of her employment. A reasonable jury, noting that these infractions occurred between one and three months after her attorney notified the company of her EEOC charge, might well question whether the record of these infractions was merely an attempt "to manufacture facially legitimate reasons for termination when [the company's] true motive was retaliation, at least in contributing part." *Ameristar Airways*, 650 F.3d at 569.

Ms. Zaire has sought to show that each of the alleged infractions "is bogus and a pretext for retaliation." Surreply 6. Indeed, for each allegation the company leveled against her, Ms. Zaire has offered an alternate version of events. For example, she denies PST's assertion that she lacked authorization to close the store two hours early on February 12, 2016. According to her account of what transpired that evening, she told her supervisor, Mr. Fraser, that she would like to shut the store down at 5 p.m., rather than 7 p.m., because the forecast was calling for "a lot of snow." Zaire Dep. 163:15-164:5. She also told him that store policy required her to close at 5 p.m. because, if she did not, she would be alone in the building, and "'[b]y protocol,' which was always in place, 'no one is supposed to be in the building closing by themselves.'" *Id.* at 164:5-10. Mr. Fraser told

her it would be all right to "shut down and go" after Ms. Jones left for the day, which she did shortly before 5 p.m. *Id.* at 154:13-165:4; *see also* ECF No. 52-3, Ex. 13.

Ms. Zaire similarly disputes the company's allegation that she failed to tell her supervisor the next morning she would not be making it into work after her car slid on a patch of black ice and became stuck in some mud. She testified that she called Mr. Fraser from the roadside and told him what had happened. *See id.* at 183:7-19. "I said, 'I'm not making it. My car just went off the road, and I'm waiting for AAA to tow me back home. Once I get towed home, I have no other vehicle to get to work." *Id.* at 195:9-12; *see also* ECF No. 52-3, Ex. 13. Mr. Fraser has confirmed that Ms. Zaire called him that morning to tell him about the accident but said she told him only that she would be late. *See* Fraser Dep. 212:6-18.

Along similar lines, Ms. Zaire disputes the company's account of her March 11, 2016 conversation with Mr. Morabito about the .40-caliber bullets he wanted to buy. Ms. Jones's March 17, 2016 statement asserts that Ms. Zaire told him, falsely, that the ammunition was "on order." First Jones Statement 1. Ms. Zaire has maintained that what she actually told him was not that she had *already* ordered the bullets he wanted, but that "we were placing an order" for them. Zaire Dep. 204:18-205:3. She said she explained to Mr. Morabito that the store had just sold its last six boxes of that particular type of ammunition. *See id.* at 204:18-21. She testified that she did, in fact, call a supplier that day to ask for a quote and that she left a voicemail, then followed up later via email. *See id.* at 205:9-206:3, 209:5-7. Ultimately, she placed an order to buy the ammunition from a different vendor on March 15, 2016 – four days after the interaction with Mr. Morabito. *See* Second Jones Statement 1.

Ms. Zaire contests the particulars of the other allegations against her as well. She denies, for instance, that the instructor who asked to buy targets on March 12, 2016, had entered the store

10 minutes before closing time. *See* Zaire Dep. 209:8-15. The truth, she said, is that he came in after business hours were over and the register had been shut down for the day. *See id.* Ms. Jones's investigation report does not contradict this aspect of Ms. Zaire's account, but rather emphasizes that the store had "'appeared' open to the client." March 2016 Investigation Report 2. Ms. Zaire, meanwhile, denied being rude to the instructor and said she directed him to the facility's range safety officer, who could give him the targets even after the store was closed. *See* Zaire Dep. 210:15-19.

Ms. Zaire has also maintained that her count of the money in the safe at the end of her shift on March 12, 2016 was accurate. *See* Second Jones Statement 3. She has suggested that her supervisor, Mr. Fraser, might have taken money from the safe, alleging that he "had a history of taking money from the store safe without permission and merchandise for his personal use." Surreply 14. Ms. Hedrick, the finance manager, has corroborated these allegations, testifying that Mr. Fraser had, on several occasions, taken $20 or so from the till for personal reasons, such as buying gas for his car. *See* Hedrick Dep. 59:19-60:15, 127:16-20. Ms. Hedrick also recalled an instance in which Mr. Fraser took a pair of boots from the store and did not pay for it until sometime later. *See id.* at 63:19-64:15. Ms. Hedrick said no such allegations had ever been raised against Ms. Zaire. *See id.* at 93:2-6.

PST dismisses Ms. Zaire's assertions as self-serving and urges me to disregard them, citing, among other cases, *Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th Cir. 2004)). Reply 20. But in *Mackey*, I note, the retaliation claim was not decided on a motion for summary judgment. As a matter of fact, the district court had denied the employer's motion for summary judgment on that claim and only entered judgment for the employer at the conclusion of a two-day bench trial. *See* 360 F.3d at 467. And while the Fourth Circuit affirmed the district court's judgment, it did not

state, as PST suggests it did, that a plaintiff's uncorroborated statements *of fact* are "not to be credited." Reply 20. It simply stated that "[a] plaintiff's own self-serving *opinions*, absent anything more, are insufficient to establish a prima facie case of discrimination." *Mackey*, 360 F.3d at 469-70 (emphasis added). The points of contention I have just recounted are not matters of opinion; they are questions of fact, and so long as those questions are genuine and material, a grant of summary judgment would be improper.

PST also argues the decisions to discipline and fire Ms. Zaire could not have been retaliatory because Ms. Jones, the office manager who investigated the allegations against her, said she did not recall ever seeing Ms. Zaire's EEOC charge before conducting the investigation. *See* Def.'s Mem. 31; Kathy Jones Dep. 126:7-12, ECF No. 52-7. But Ms. Jones explained that it was Mr. Morabito who wrote the March 2016 letter of counsel and made the decision to issue Ms. Zaire a three-day suspension. *See* Kathy Jones Dep. 115:15-16, 117:6-7. Ms. Jones did lead the investigation into the incidents in question, but she testified that she was not the one who initiated the investigation. *See id.* 101:17-20. I note, too, that each of the written statements Ms. Jones issued in connection with her investigation includes the sentence, "I am making this statement at the request of my employer." First Jones Statement 1; *accord* Second Jones Statement 1. And, for that matter, the March 17, 2016 statement concludes by saying, "At this point, *we* have zero confidence in Ms. Zaire['s] ability to perform her position as Assistant Retail Manager," First Jones Statement 3 (emphasis added), suggesting Ms. Jones was speaking not merely for herself, but for other members of management.

To sum up, Ms. Zaire does not concede that she committed the infractions that precipitated her suspension and termination, and the record does not unequivocally contradict her account of those incidents. She has advanced the theory that the management team strung together a series

of minor, arguable transgressions in order to justify a foregone decision to end her employment. PST has not persuaded me that a reasonable jury, given the chance to consider all of the many discrepancies in the parties' accounts of these incidents, could not credit Ms. Zaire's version of events. For this reason, I am denying the company's request for summary judgment on this claim.

## CONCLUSION

Ms. Zaire's hostile work environment and retaliation claims may proceed. With respect to the former (Count 1), I conclude that this count encompasses claims for both sexual harassment and racial harassment. I hold, though, that Count 1 may proceed only insofar as it seeks relief for the company's failure to respond appropriately to Ms. Zaire's complaints about Mr. Mlynarski's behavior. Ms. Zaire may not assert this claim on the basis of her separate allegations that her supervisors had likewise harassed her because of her race, as she did not present those allegations to the EEOC.

A separate order follows.

Date:   May 29, 2019

_5/29/2019_

Paul W. Grimm
United States District Judge